**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 7:18-CR-19 (HL) |
| **DOUGLAS MOSS,** | |
| Defendant. | |

## ORDER

On May 14, 2019, following a seven-day trial, the jury hearing this matter returned a verdict finding Defendant Douglas Moss guilty of conspiring to commit health care fraud as well as six substantive counts of health care fraud. (Doc. 118). The Court sentenced Defendant on November 4, 2019, to a term of imprisonment of 97 months. (Doc. 174). Now before the Court is Defendant's Motion for New Trial (Doc. 137) and Amended Motion to Delay Reporting or for Bond Pending Appeal (Doc. 189).[1] For the following reasons, Defendant's motions are **DENIED**.

## I.    BACKGROUND

A grand jury in this district returned an indictment against Defendant Dr. Douglas Moss and co-Defendant Shawn Tywon on May 8, 2018. (Doc. 1). Count One of the indictment charged Dr. Moss and Tywon with conspiring to commit health care fraud. (Id. at p. 5- 11). Counts Two through Seven charged Defendants

---

[1] Defendant's Motion Requesting the Court Grant Dr. Moss's Motion for New Trial (Doc. 177) is **DENIED as moot**.

with six substantive counts of health care fraud. (Id. at p. 11-12). Defendants made their initial appearances and entered pleas of not guilty on June 12, 2018. (Docs. 20, 23).

On September 7, 2018, the Court entered a Scheduling Order (Doc. 44), the terms of which were agreed upon and jointly proposed by the parties. The Order set forth specific deadlines for producing discovery and filing motions and scheduled a firm trial date of May 6, 2019. (Id.). The Court agreed to modify the Scheduling Order on February 15, 2019, to extend the deadline for the Government to file its Rule 404(b) notice and to extend the deadline for both the Government and Defendants to identify any expert witnesses. (Doc. 46).

Tywon pled guilty to Count One of the indictment on April 11, 2019. (Doc. 67). Dr. Moss elected to exercise his constitutional right to proceed to trial. In the weeks leading up to trial, a number of evidentiary issues arose, two of which pertain to Dr. Moss's motion for new trial: (1) the production of reciprocal discovery by the defense; and (2) the motion to quash a subpoena issued by Dr. Moss to counsel for Shawn Tywon.

Production of Defense Discovery

On March 25, 2019, six weeks before trial was set to begin, Dr. Moss filed an Ex Parte Application for Subpoenas under Federal Rule of Criminal Procedure 17, requesting that a subpoena duces tecum be issued to each of the following healthcare facilities: Pruitt Health – Crestwood Nursing Home; Pruitt Health – Lakehaven Nursing Home; Pruitt Health – Valdosta Nursing Home; Pruitt Health –

Holly Hill Nursing Home; South Georgia Medical Center; and Smith Northview Hospital. (Doc. 56). Through these subpoenas, Dr. Moss hoped to gather records he believed would demonstrate the legitimacy of the services he rendered to his patients and billed to Medicare and Medicaid. (Id. at p. 3). The Court granted Dr. Moss's motion and issued a firm disclaimer:

> the Court warns Defendant that under no circumstances will the specially set trial, scheduled to begin on May 6, 2019, be continued in this case for any reason relating to the issuance of the subpoenas, production of documents, or review of documents provided as a result [of] the subpoenas that are the subject of this Order.

(Doc. 61, p. 3). The Court's caution proved providential.

The same day Dr. Moss moved to subpoena the medical records, the Government filed its motion for the production of reciprocal discovery. (Doc. 59). As part of the Scheduling Order, and consistent with the Court's Standard Pretrial Order (Doc. 19), Dr. Moss agreed to provide any reciprocal discovery to the Government by October 31, 2018. (Doc. 44). However, as of March 25, 2019, Dr. Moss still had produced no materials to the Government. The Court heard the Government's motion on April 3, 2019, at which time counsel for Dr. Moss revealed that they were "seeking other records and other information and trying to figure out what we're going to present, whether we're going to present, or whether we're going to rest on their failure to present." (Doc. 70, p. 60). Counsel further acknowledged their responsibility to provide any reciprocal discovery and agreed that, "as we identify documents that are necessary, we'll turn them over to the government." (Id.).

The Government then moved the Court to establish a date certain for Dr. Moss to produce reciprocal discovery to prevent Dr. Moss from conducting "a trial by ambush." (Doc. 65, p. 1). The Court entered a text Order on April 12, 2019, instructing Dr. Moss to respond to the Government's motion by 5:00 p.m. on April 17, 2019. (Doc. 69). Dr. Moss responded to the Government's motion, stating, "[t]he Defense has not yet identified any specific documents that they intend to use in their case-in-chief at trial. The Defense has however identified [four] groups of documents that contain patient and billing information that the Defense may seek to introduce in its case-in-chief." (Doc. 75, p. 1). Two of those groups of documents included records from an electronic system known as Par 3 utilized by Dr. Moss's medical practice at South Georgia Health Group and the documents Dr. Moss subpoenaed from the nursing homes – neither of which were in Dr. Moss's possession as of his April 17, 2019, response to the Government's motion. (Id. at p. 2-3).

The Government filed a Notice of Discovery Violations and Motion to Exclude on April 24, 2019. (Doc. 78).[2] The motion outlined the ongoing saga of the documents to which counsel for Dr. Moss continued to allude but had not produced. (Id. at p. 1-2). The Government noted that on April 22, 2019, two weeks before the start of trial, defense counsel uploaded over 50,000 pages of electronic discovery to the Government's cloud file exchange server. (Id. at p. 3). The

---

[2] This same motion was filed again on April 25, 2019, and appears on the docket as a Motion to Exclude. (Doc. 84).

Government's motion additionally highlighted inconsistencies in representations made by defense counsel about the availability of the Par 3 records. (<u>Id.</u> at p. 5-7). Pursuant to Federal Rule of Criminal Procedure 16(d), the Government moved the Court to exclude all of the evidence identified in Dr. Moss's April 17, 2019 response, with the exception of 6,000 pages of materials that were previously provided to the Government in response to the Office of Inspector General subpoenas and the Civil Investigative Demand issued by the United States Attorney's Office. (<u>Id.</u> at p. 9). Alternatively, the Government requested a six-month continuance of the trial. (<u>Id.</u>).

The Court held a pretrial conference on May 1, 2019. After hearing from both parties, the Court denied the Government's motion to exclude outright the voluminous records produced by the defense. The Court then ordered Dr. Moss to provide any specific documents he planned to introduce at trial to the Government by noon on May 3, 2019. (Doc. 96). The Court provided Dr. Moss with detailed instructions regarding how each document should be identified and warned that failure to follow the Court's instructions would result in the exclusion of the evidence at trial. (<u>Id.</u>). Dr. Moss moved the Court to reconsider this Order. (Doc. 104). The Court conducted a telephone conference on May 3, 2019, to again address the issue of these exhibits. Dr. Moss suggested that the Court grant a 60-day continuance to permit him more time to sort through the records and comply with the Court's previous order concerning the marking of the exhibits. (Doc. 106).

The Court denied that request and directed the parties to prepare to select a jury on May 6, 2019.

Trial began on May 6, 2019. On May 8, the third day of the trial, the issue of the voluminous and still unproduced exhibits came to a head during the testimony of Charles Bryant, a former employee of Dr. Moss. During his cross-examination of Mr. Bryant, defense counsel sought to introduce what counsel identified to the Court as a checklist Mr. Bryant would complete when making rounds at the hospital. (Doc. 140, p. 188, 190). The Government objected, stating that the document was one of the 50,000 improperly produced records. (Id. at p. 190). Addressing defense counsel, the Court summarized the problem:

> The defendant produced, several days before trial, a group of documents that numbered in the tens of thousands of pages. I don't know exactly how many [thousands] there are. I've heard somebody say 40, I've heard somebody say 50, it really doesn't make any difference.
>
> It was the Court's decision that those documents, which could have been produced earlier, were not produced in a timely fashion. And the Court's last order was an attempt to allow the defense to use these documents, provided the use of the documents by the defense was done in a way that allowed the government reasonable notice of what was going to take place.
>
> The order provided, among other things, that you highlight the portions of the documents that you were going to use. That was in the nature of a carrot. I was trying to get the job done. I am not particularly concerned about the lack of the highlighting, but I am concerned about the fact that you're now attempting to use a number of those documents, which, as far as I know, [are] completely unknown to the government.

(Id. at p. 192-93).

The Court then questioned counsel about how the particular document counsel sought to introduce through Mr. Bryant was produced to the Government. (Id. at p. 193). Counsel explained that the document was placed in a folder containing 184 pages and labeled "Hospital Patient Visit Logs." (Id. at p. 194). Other than labeling the folder, defense counsel did not otherwise indicate to the Government how they intended to introduce this particular evidence at trial.

Through further inquiry by the Court, it became apparent that the document in question was not necessary to establish the point the defense wished to make: that the witness visited patients at the hospital. (Id. at p. 195). As the Court pointed out, the witness could testify about the services he performed and with what frequency. (Id. at p. 195-96). The Court further made clear that at some point the Court would have to to make a final decision regarding the thousands of pages of documents defense counsel failed to produce in compliance with the Court's Orders (Docs. 19, 44, 96):

> I want to be fair to the defendant. I want the defendant to have a fair trial. You all have not done what you were ordered to do. And I'm trying to put off as long as I can making that decision.

(Doc. 140, p. 196). Defense counsel then withdrew the exhibit. (Id.).

After a brief recess the Court returned and gave defense counsel yet another opportunity to organize their exhibits and to confer with the Government:

> The documents were not produced in a timely fashion. The appearance of the thing to me is that the defendant deliberately did not produce these documents in a timely fashion and in a fashion in which they can be reasonably interpreted by the government, in time to give the government notice of what they contained at trial.

I've done everything that I know to do to try to persuade counsel on both sides to correct this problem. I don't want to be backed into a corner with respect to any ruling that I may make regarding these documents on a technicality.

I'm afraid if the documents are ruled out *in toto*, that a miscarriage of justice could result.
. . . .

If you all are going to use these things, Mr. Garland, they have got to be condensed, and they've got to be explained to the government before you can do that.
. . . .

And if the defense makes a good faith effort to do that, Madam Prosecutor, then I expect the government to operate in good faith and be reasonable about what the defense is trying to do.

(Id. at p. 197-98).

The Court thereafter agreed to permit defense counsel to cross examine the witness about his hospital notes and directed the parties to spend the afternoon conferring about the remainder of the defense exhibits. (Id. at p. 203-04).[3] The parties' conference proved fruitful, and they were able to arrive at an agreement concerning the use of the defense exhibits. (Doc. 141, p. 5-6).

On day four of the trial, however, trouble with the defense exhibits arose yet again during the testimony of co-Defendant Tywon. (Doc. 141, p. 106). Defense counsel informed the Court that they provided the Government that morning with eight documents they wished to use during their cross-examination of Tywon. (Id.

---

[3] Ultimately, the exhibit that instigated this conversation was not tendered into evidence during the trial. (Id. at p. 216).

at p. 106, 109). Defense counsel further stated that Dr. Moss identified another 45 pages during the evening recess that might be pertinent to their cross-examination. (<u>Id.</u> at p. 107). However, those particular documents had neither been reviewed by defense counsel nor provided to the Government. (<u>Id.</u>). The Court instructed defense counsel to provide the documents to the Government during the lunch break. (<u>Id.</u> at p. 110). Upon returning from lunch, defense counsel recounted which documents had been provided to the Government and then requested a continuance of several hours to discuss the documents with Dr. Moss. (<u>Id.</u> at p. 116). The Court instead suggested that defense counsel proceed with his cross-examination of Tywon and, should admission of the documents become an issue, the Court then would address how best to proceed. (<u>Id.</u> at p. 117).

The Court took a brief recess to permit the parties time to confer about the records the defense wished to use purportedly to impeach the testimony of Tywon. Upon resuming the proceedings, the Government voiced a number of objections to the introduction of the records, including authentication, relevancy, and potential hearsay. When asked by the Court how specifically the documents would contradict the witness's testimony, defense counsel replied, "Your Honor, I cannot affirmatively state exactly what these documents show. We are reviewing them currently." (<u>Id.</u> at p. 178). The Court then ruled that "[t]he documents will not be used." (<u>Id.</u>). There was no further discussion of any of the defense exhibits.

Motion to Quash

In his plea agreement with the Government, co-Defendant Tywon made the following admission:

> TYWON was paid $4500 bi-weekly by MOSS and did not receive a raise since he began working for MOSS. Aside from his paychecks and occasional loans from MOSS, TYWON received no other form of compensation.

(Doc. 66, p. 15). However, during his trial preparation meeting with the Government, Tywon indicated that he received additional forms of compensation from Dr. Moss, including sums "for the occasional car payment or credit card payment, the occasional grocery and/or retail purchase when shopping together, as well as a $1,000 payment for him to hire a bankruptcy attorney." (Doc. 86, p. 3). Tywon also stated that he received other cash payments, ranging from $1,000 to $4,000, which Dr. Moss "would arbitrarily withhold or reduce at his discretion." (Id.).

When asked why he did not reveal this information earlier, Tywon stated that his attorney instructed him not to mention the additional cash payments unless specifically asked. (Id. at p. 4). At this point, the Government ceased trial preparation until they could speak with Tywon's attorney, Miles Hannan. (Id.). Hannan denied advising his client to conceal facts. (Id.). The Government then promptly filed its Motion for Expedited Inquiry into the Qualification of Counsel (Doc. 86), which the Court addressed at the May 1, 2019, pretrial conference. (Doc. 109, p. 4-15, 19-22).

The Court met with Tywon and Hannan in chambers to delve further into the purportedly inconsistent statements made by Tywon that the Government contended potentially amounted to a material breach of his plea agreement. (Id. at p. 15-19).[4] The Court also sought to resolve any issues with what advice, if any, Hannan may have provided his client to withhold information from the Government. (Id.). Tywon explained that during his first meeting with the Government, he described how Dr. Moss compensated him, including his monthly income and some loans. (Id. at p. 16). Following that meeting, Tywon expressed concern to his attorney that they had not discussed the other forms of income he received from Dr. Moss. (Id.). Hannan then tried to contact the Government and left a message asking that the Government return his call. (Id.). The matter was then forgotten until the Government presented the first draft of the plea agreement. (Id.). Tywon asked his attorney if the additional income needed to be included in the language of the plea agreement, to which Hannan then responded something along the lines of "I'm not prepared to do it today, but we will get to it." (Id.). But the parties never modified that particular language of the plea agreement, and the version signed by the parties filed by the Court includes the original language. (Doc. 66). Following Tywon's plea, Hannan told Tywon "to tell everything – to explain everything in detail at the pretrial – at the prep." (Doc. 109, p. 16).

---

[4] While these proceedings took place outside of the presence of the Government and Dr. Moss, the Court had the conversation transcribed and made a part of the record in the case. (Id. at p. 19).

Tywon also discussed the additional forms of income with the United States Probation Office. (Id. at p. 17). He attempted to outline in more detail the various methods Dr. Moss employed to compensate him. (Id.). The payment structure was confusing to both Tywon and the Probation Officer. (Id.). The Probation Officer asked why Tywon had not discussed these matters earlier. (Id. at p. 18). Tywon stated that during the past year and a half, he had been dealing with a number of issues, and that he largely forgot about some of the details. (Id. at p. 17). He also said that he had not had the opportunity to provide a more detailed explanation. (Id. at p. 18). Tywon maintained to the Court that neither he nor his attorney ever intentionally deceived the Government:

> After the – after I met with them, I sent Mr. Hannan an e-mail that said, you know, "They asked me about the income, I told them all about it," I said, "but I think they're a little bit concerned about the Plea Agreement."
>
> And his response was I think, "Great. There is no secrets in cooperation," was his e-mail that he sent to me. So I don't think in any way he was telling me not – to not tell them. We just never got to a point where we could sit down and talk about it.

(Id.).

Hannan also clarified that "this income has been there all along" and that the "money that [Tywon] was receiving in the form of cash was later considered to be loans." (Id. at p. 19). The plea agreement explicitly references these loans. (Id.).

The Court thereafter concluded that there was no intentional deceit by Tywon or misconduct by Hannan. (Id. at p. 19-20). The Court opined that "as is so

often the case in these matters, that the – there's been a misconstruction or a misunderstanding about what was said." (Id. at p. 20).

On May 1, 2019, Dr. Moss served a Subpoena to Testify at a Hearing or Trial in a Criminal Case on Miles Hannan. (Doc. 97-1). Hannan moved to quash the subpoena and stated that "[a]ny information sought to be solicited by Co-Defendant DOUGLAS MOSS would be privileged and confidential pursuant to F.R.E. 501." (Doc. 97, ¶ 3). Dr. Moss responded to the motion to quash, arguing that the motion should be denied (1) because Tywon voluntarily waived the attorney-client privilege; and (2) because "Hannan's testimony is essential to establish that Tywon has told lies to the government – not only in his initial debriefing, but also in his subsequent lies that sought to justify his earlier lies during the initial debriefing." (Doc. 103, p. 3).

At trial, Tywon's veracity was thoroughly probed by both the Government and Dr. Moss. During its direct of Tywon, the Government published the plea agreement and directed Tywon to the paragraph outlining the compensation he received from Dr. Moss. (Doc. 141, p. 91). The Government then asked whether the statement was misleading. (Id.). Tywon responded affirmatively, explaining that he "actually received cash payments and check payments from him that were not included in this." (Id.). Tywon then testified that he received varied payment from Dr. Moss, which Dr. Moss told him were in the nature of loans. (Id. at 91, 93).

Between the Government concluding its direct examination and Dr. Moss commencing his cross-examination of Tywon, the Court heard argument on

Hannan's motion to quash the subpoena. (Id. at p. 111-115). The Court then permitted defense counsel to question Hannan about his conversations with the Government concerning any inconsistent information Tywon may have provided during his pre-trial preparation. (Id. at p. 112-14). Following this exchange, defense counsel agreed that a ruling on the motion to quash was not necessary at that juncture:

> MR. ED. GARLAND: I expect – after I've questioned Mr. Tywon, I expect to ask him, did he make the statements to the government investigator. And then if he admits he did make those statements, and then I'll ask him whether that was a lie. And if he says it's a lie, then he won't be needed.
>
> THE COURT: Well, then I'll just reserve ruling on the motion. We'll see what happens.
>
> MR. ED GARLAND: I agree, You Honor.

(Id. at p. 114-15).

Defense counsel thoroughly cross-examined Tywon about his truthfulness with the Government:

> Q. And the first thing you did, before you got your agreement, is you entered into a proffer agreement in which you told the government you'd tell the truth; right?
>
> A. Yes.
>
> Q. But I've heard you say here that when it came to the money, you didn't tell the truth; right?
>
> A. Correct.
>
> Q. All right. So you have told us that you didn't tell the truth about that because you had some – you had a misunderstanding. Is that what you said?

A. Correct.

Q. Now, did you misunderstand the truth when you were asked how much money did you get? You understood that called for a pretty straightforward answer; didn't you?

A. Yes, sir.

Q. And so you did, in response to that, not tell the truth; right?

A. On that part, yes.

(Id. at p. 119-20). After going through several iterations of this same line of questioning, defense counsel inquired specifically about statements Tywon made to the Government about instructions he received from his attorney:

Q. I want to know exactly what you said when you were justifying having lied about the money, about your attorney and his conduct.

A. When they asked, they said, "Why didn't you tell us sooner?"

I said, "My attorney told me not to volunteer that until it was asked – or not to reveal that until I was asked."

(Id. at p. 125). Defense counsel asked no follow up questions about Tywon's conversation with his attorney.

At the conclusion of the fifth day of trial, the Court asked defense counsel whether they intended to pursue Hannan's testimony and, if so, for what purpose. (Doc. 142, p. 196). Defense counsel explained that Hannan's testimony would be used to impeach Tywon's testimony and to demonstrate that Tywon lied about his attorney instructing him to withhold information from the Government. (Id. at p.

196-97). After considering the defense's argument, the Court granted Hannan's motion to quash the subpoena:

> Your entire thesis rests on the proposition that you've established a waiver of some sort. That somehow Mr. Tywon has waived his attorney-client privilege on this point.
>
> In order to do that, under Rule 502, you've got to do one of two things. You've got to show that the waiver was intentional or you've got to show that it was inadvertent. I find that you've shown neither of those things.
>
> In the absence of that, there's been no waiver. In the absence of a waiver, Hannan cannot testify, and the Motion to Quash is granted.

(Id. at p. 197).

## II.  MOTION FOR NEW TRIAL

Defendant contends that he is entitled to a new trial on three grounds: (1) the Court's decision to grant Miles Hannan's motion to quash; (2) the Court's exclusion of evidence; and (3) the Court's limitation on Defendant's closing argument.  The decision to grant or deny a motion for new trial rests in the sound discretion of the trial court. United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985). A district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. However, "[c]ourts are to grant them sparingly and with caution, doing so only in those really exceptional cases." Martinez, 763 F.2d at 1313. "The Court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Id. at 1312-13 (citations omitted).

### A.    Motion to Quash

Defendant argues that by quashing the witness subpoena issued to Miles Hannan, counsel for co-Defendant Tywon, the Court violated his Sixth Amendment right to compulsory process. Defendant also avers that the Court erroneously shifted the burden of proving waiver of the attorney-client privilege onto Defendant.

### 1.    Sixth Amendment

A defendant's Sixth Amendment right to present witnesses that are "both material and favorable" to his defense is well-established. See Taylor v. Singletary, 122 F.3d 1390, 1394 (11th Cir. 1997). However, "more than the mere absence of testimony is necessary to establish a violation of the right." United States v. Valenzeula-Bernal, 458 U.S. 858, 867 (1982). "Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining witnesses *in his favor*.'" Id. (emphasis in original) (quoting U.S. Const. amend. VI.). A defendant thus "must at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." Id.

The Supreme Court has further explained that the Sixth Amendment right to compulsory process is not violated where admission of the omitted evidence would not have created reasonable doubt:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has

been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

United States v. Agurs, 427 U.S. 97, 112 (1976).

Defendant subpoenaed Hannan solely to impeach Tywon's testimony that when the Government asked why he did not disclose additional sources of income from Defendant he stated that his attorney instructed him not to reveal the information until specifically asked. (Doc. 141, p. 114-15; Doc. 142, p. 196-96; Doc. 137, p. 8). According to Defendant, Hannan's testimony "was both material and extremely favorable" to the defense's theory "that Tywon's claims of conspiracy were the result, not of a conspiracy, but instead of Tywon's own *modus operandi* of protecting himself by lying and blaming others for his own deceit." (Doc. 137, p. 8). But breaching the attorney-client privilege was not necessary for Defendant to attack Tywon's veracity. The Court granted Defendant sufficient latitude to explore any inconsistencies in Tywon's testimony, particularly regarding any statement he may have made concerning his income. (Doc. 141, p. 118-26). Defendant was even permitted to question Tywon about the alleged conversation with his attorney. (Doc. 141, p. 125). However, Defendant's cross-examination on this point stopped after Tywon admitted to telling the Government that his attorney told him not to volunteer certain information until asked. (Id.). Defendant never followed up to ask

Tywon if the statement was true. The decision to limit this line of questioning was Defendant's alone.

Defendant has not shown that Hannan's testimony would have created a reasonable doubt that did not otherwise exist. <u>Agurs</u>, 427 at 112. As the Government points out, Defendant "was able to elicit substantially similar evidence from other sources to the claimed inconsistency without infringing upon Mr. Tywon's Sixth Amendment right to counsel." (Doc. 145, p. 4). Furthermore, taking the record as a whole, with or without the inclusion of Hannan's testimony, there is no reasonable doubt of Defendant's guilt and hence no justification for a new trial on this basis. <u>Agurs</u>, 427 at 112.

## 2. Waiver of Attorney-Client Privilege

On May 1, 2019, Defendant served Miles Hannan with a subpoena to appear in Court on May 6, 2019, to testify in these proceedings. (Doc. 97, ¶ 2; Doc. 97-1). The issuance of the subpoena correlated with a motion filed by the Government calling into question the ability of Hannan to continue representing co-Defendant Tywon after Tywon made an uncounseled statement to the Government during his trial preparation that his attorney advised him not to volunteer information about other forms of compensation he received from Defendant. (Doc. 86). The Court addressed the Government's concerns through an in camera conversation with Tywon and Hannan and ultimately found that the whole scenario was the result of a misunderstanding or miscommunication. (Doc. 109, p. 15-19).

Hannan promptly filed a Motion to Quash Subpoena, stating that any information to which he might testify he gained as a result of his representation of Tywon. (Doc. 97, ¶ 3). Hannan further asserted that any testimony he may provide is protected by attorney-client privilege. (Id.). Defendant responded to the motion, stating that the defense wished only to solicit testimony from Hannan "to establish that Tywon has told lies to the government" and arguing that Tywon voluntarily waived the attorney-client privilege "by testifying about what his lawyer told him." (Doc. 103, p. 3). Upon hearing argument from Hannan and Defendant, the Court concluded that there had been no waiver of the privilege and granted the motion to quash. (Doc. 142, p. 197). Defendant argues that in granting the motion the Court erred by impermissibly shifting the burden of demonstrating waiver from Tywon or Hannan to Defendant.

Federal Rule of Civil Procedure 45 mandates that a court to quash any subpoena whose compliance "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii). Here, Hannan moved the Court to quash the subpoena because any communication between him and Tywon were protected by attorney-client privilege. (Doc. 97, ¶ 3; Doc. 142, p. 111). And, to the extent that any waiver may apply, "[a]nything that would be subject to the waiver . . . would be information that's already been made known to the government and is part of discovery and/or could be asked of Mr. Tywon while he [was] on the witness stand." (Doc. 142, p. 111).

Under Federal Rule of Evidence 502, a disclosure made in the course of a federal proceeding or to a federal officer does not operate as a waiver of attorney-client privilege if "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error." Fed. R. Evid. 502(b). "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship exists and that the particular communications were confidential." Bogle v. McClure, 332 F.3d 1347, 1358 (11th Cir. 2003) (quoting United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991)).

While the Court misspoke when it suggested that the burden lay with Defendant to establish a waiver of the privilege (Doc. 142, p. 197), the evidence in the record otherwise supports the Court's conclusion that there was no waiver. There is no dispute that an attorney-client relationship existed between Tywon and Hannan and that any communications between them in that capacity were confidential. Furthermore, it is apparent that the statement Tywon made to the Government concerning his conversation with Hannan about the various forms of compensation he received as a result of the alleged conspiracy was inadvertent – and misunderstood. (Doc. 109, p. 18-19). Counsel for the Government even described the statement as spontaneous. (Id. at p. 6). In this instance, it was the Government who took steps to prevent further disclosure by ceasing all conversations with Tywon. (Doc. 86, p. 4; Doc. 109, p. 6). Based on this evidence, the motion to quash was properly granted.

Even if the Court did err in granting the motion to quash, exclusion of Hannan's testimony still does not establish a sufficient basis for granting a new trial. The Court permitted Defendant to cross-examine Tywon about his conversations with his attorney and to probe Tywon's credibility, which was at the heart of Defendant's alleged defense.

## B.    Limitation and Exclusion of Evidence

Defendant asserts that he is entitled to a new trial because the Court denied his Sixth Amendment right to present a complete defense by limiting the evidence he presented at trial. First, Defendant contends that the Court erred by restricting the number of witnesses Defendant was permitted to call to establish his defense. Second, Defendant argues that the Court erred by not continuing the trial to permit Defendant additional time to review the voluminous documents he subpoenaed in the weeks leading to trial.

### 1.    Restriction on the Number of Witnesses

In his defense, Defendant called a number of former patients to rebut the Government's characterization of Defendant "as a greedy man, more interested in money than patient care, lacking compassion, and indifferent to his patients – the very kind of person that would be willing to defraud Medicare, even at the cost of his patient's health." (Doc. 137, p. 17). Defendant introduced the testimony of five such witnesses before the Court declared that it would hear no further character evidence. (Doc. 143, p. 97-98). The Court explained that any similar testimony "would be cumulative." (Id. at p. 100).   Defendant claims this decision was

erroneous, explaining that the "quantity of the people willing to testify" on his behalf was important because "[w]hile the jury could have easily dismissed the opinions of the few witnesses the defense was allowed to present, it would have been far more difficult to dismiss those opinions when they were supported by patient, after patient, after patient." (Doc. 137, p. 17).

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). "A defendant's right to a fair trial is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor." United States v. Ramos, 933 F.2d 968, 974 (11th Cir. 1991). Nevertheless, "[w]hile the Constitution unquestionably provides a defendant with the right to be heard, this right is not unbounded." United States v. Frazier, 387 F.3d 1244, 1271 (11th Cir. 2004); see also United States v. Mitrovic, 890 F.3d 1217, 1221 (11th Cir. 2018) (A defendant's right to present witnesses in his defense "is not absolute, and is subject to reasonable restrictions."). "These bedrock principles establish that, while a criminal defendant must be given every meaningful opportunity to present a complete defense, in doing so he must comply with the procedural and evidentiary rules designed to facilitate a search for the truth." Frazier, 387 F.3d at 1272.

Here, the Court's limitation on Defendant's character evidence did not violate his right to a fair trial. Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." Fed. R. Evid. 403. Defendant's

objective in introducing the testimony of his former patients was to address the Government's characterization of him as "greedy," "indifferent," and "lacking compassion." (Doc. 137, p. 17). The five witnesses who testified about their favorable opinion of Defendant and the care he rendered on their behalves accomplished that goal. Any additional similar evidence would have been cumulative and was properly excluded.

## 2. Denial of Continuance

Defendant claims that the Court violated his Sixth Amendment right to present a complete defense when the Court denied his motion to continue trial. (Doc. 137, p. 18). Defendant's objective in requesting the continuance was to gain time to more thoroughly examine the hospital and nursing home records he obtained through his Rule 17(c) subpoenas. (Id.). Defendant claims that these records "were relevant to disprove [and rebut] the central allegations of the trial that no treatment was ever done on the patients in the nursing home by Dr. Moss or his mid-levels." (Doc. 148, p. 9).[5]

---

[5] As was symptomatic throughout these proceedings, Defendant's contention that the hospital and nursing home records would rebut the "central allegations of the trial that no treatment was ever" performed, misstates the Government's theory of the case. (Doc. 148, p. 9). The Government never argued that Defendant provided no care to his patients and, in fact, concedes in its response to Defendant's motion that the evidence at trial demonstrated that Tywon "provided some medical care to nursing home patients on many occasions." (Doc. 145, p. 7-8). Rather the crux of the Government's case against Defendant is that he billed Medicare and Medicaid for services that he either was not physically present to perform or that should have been billed at a lower reimbursement level.

The issue of the defense exhibits is a problem solely of Defendant's making. Defendant was indicted on May 8, 2018, and made his initial appearance in this Court a month later on June 12, 2018. (Docs. 1, 20). Yet he waited until March 25, 2019, nearly nine months after his first appearance and roughly six weeks before trial was specially set to begin, to request the subpoenas. (Doc. 56). Not wanting to limit Defendant's ability to present a defense, the Court reluctantly obliged Defendant's late request on March 29, 2019, and allowed Defendant to send the subpoenas. (Doc. 61). In doing so, however, the Court explicitly warned Defendant that while the Court agreed to issue the subpoenas, "under no circumstances will the specially set trial . . . be continued . . . for any reason relating to the issuance of the subpoenas." (Doc. 61, p. 3). Defendant failed to heed this warning.

After the Court granted Defendant's motion, Defendant delayed issuing the subpoenas for another week until April 5, 2019. This further delay left very little hope that the documents could be produced and reviewed before the first day of trial on May 6, 2019. (Doc. 78, p. 7). And, once in possession of the subpoenaed material, Defendant failed to sift through the documents promptly and to identify any records pertinent to his defense.

The Court predicted that Defendant would request a continuance of the trial based on the late-acquired evidence. Trying to avoid these very circumstances, the Court clearly cautioned Defendant before he issued the subpoenas that trial would not be delayed by any subsequent production of records. The Court held fast to that decision. However, even though the Court did not capitulate to

Defendant's request to postpone trial, the Court granted Defendant numerous opportunities to identify and produce to the Government the specific records he wished to introduce at trial. (Doc. 69; Doc. 70, p. 60); Doc. 75; Doc. 96; Doc. 140, p. 192-93, 196, 197-98, 203-04; Doc. 141, p. 110). Despite the leeway afforded Defendant, he was never able to comply with the Court's instructions, leading to the Court's final ruling that "[t]he documents will not be used." (Doc. 141, p. 178).

Defendant's procrastination in seeking and producing to the Government evidence he wished to present in his defense was a flagrant disregard of his obligations under Federal Rule of Criminal Procedure 16(b) and the many orders of the Court. The exclusion of the evidence about which he now complains is the direct result of his failure to prepare and to follow the Court's unambiguous instructions. Such circumstances were avoidable but not exceptional and do not justify granting a new trial.

## C.     Court's Interruption of Defendant's Closing Argument

During his closing arguments, counsel for Defendant began delving into the profitability of his client's medical practice. (Doc. 144, p. 108). Defense counsel claimed to be incredulous of the Government's suggestion that Dr. Moss's motive to defraud the Medicare and Medicaid programs was profit. (Id.). According to defense counsel, the record lacked any evidence that Dr. Moss's medical practice was earning any profit. (Id.). The Court interrupted defense counsel, stating that the argument was improper:

> Mr. Garland, I hate to interrupt you, but I ruled once in this trial that whether or not the defendant made a profit in his medical practice was not an issue in the case, and I think that's an improper argument. And I so instruct the jury. Don't argue that.

(Id. at p. 109).[6] Defendant argues that the Court's interjection deprived him of his Sixth Amendment right to a fair trial and provides grounds for granting a new trial.

The Sixth Amendment "guarantees criminal defendants a meaningful opportunity to present a complete defense." United States v. Harris, 916 F.3d 948, 959 (11th Cir. 2019) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). This guarantee extends to closing arguments, "the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." Id. (quoting Herring v. New York, 422 U.S. 853, 862 (1975)). However, the Sixth Amendment does not authorize a defendant to "make any argument he desires." Id. A district court "must be and is given great latitude . . . in limiting the scope of closing summations" and "may ensure that the argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." Id. (quoting Herring, 422 U.S. at 862).

---

[6] Defendant called in his defense Tom Gonzales, a registered diagnostic cardiac sonographer. Defendant explained to the Court that the purpose of Mr. Gonzales's testimony was to evidence the cost Defendant incurred to provide echocardiogram services to his patients. (Doc. 143, p. 55). Defense counsel stated that "there's been a lot of evidence about money he received, but no evidence about money he spent. There's been the inference he got $2 million, but no evidence whether or not he lost any money in connection with providing these services." (Id.). The Court ruled the testimony irrelevant and instructed defense counsel to move forward with his case. (Id.).

The indictment charged Defendant with six substantive counts of health care fraud in violation of 18 U.S.C. § 1347 and conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Section 1347(a) provides that it is a crime for anyone who "knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347. Section 1349 states that it is a crime for any person to attempt or conspire to attempt to commit health care fraud. 18 U.S.C. § 1349. To sustain a conviction for conspiracy, "the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." United States v. Moran, 778 F.3d 942, 960 (11th Cir. 2015). Profit is not an element of the offense of either health care fraud or conspiracy to commit health care fraud. Accordingly, the success of the scheme is not necessary in order to sustain a conviction.

The Court's interruption of Defendant's closing argument and the narrow limitation placed on what the Court permitted Defendant to argue to the jury did not violate his right to present complete a complete defense. Profit was a recurring theme in the Government's theory that Defendant's desire for increased wealth motivated him to concoct and engage in the alleged fraudulent scheme. In its closing, the Government stated, "[Defendant's] motive here is pretty

straightforward. It's profit. Profit over patients." (Doc. 144, p. 51). But whether or not Defendant's medical practice saw actual financial gains as a result of the alleged scheme is irrelevant to the determination of whether he knew of the scheme and voluntarily and knowingly joined in the venture. Accordingly, any evidence or argument that other obligations of Defendant's medical practice negated any profit he may have acquired through his fraudulent billing of Medicare and Medicaid was properly excluded.

## III. AMENDED MOTION TO DELAY REPORTING OR FOR BOND PENDING APPEAL[7]

Following the imposition of sentence, the Court entered an Order of Surrender, permitting Defendant to voluntarily surrender as directed by the United States Probation Office. (Doc. 167). Defendant has now been notified that he is to present himself to a facility designated by the Bureau of Prisons on December 10, 2019. Defendant moves the Court to postpone his report date. Alternatively, Defendant requests that the Court grant him bond pending appeal.

Defendant moves the Court to delay his report date pending the Court's ruling on his motion for new trial. In the event that the Court denies his motion, as the Court has now done, Defendant asks the Court to postpone his report date for ten days following entry of the Order on the motion for new trial. The Court **DENIES**

---

[7] The Court **finds as MOOT** Defendant's Motion to Delay Reporting or for Bond Pending Appeal. (Doc. 188).

Defendant's motion and **ORDERS** him to surrender as scheduled on December 10, 2019.

Defendant also requests that the Court grant him a bond pending appeal. The Bail Reform Act requires that a defendant who has appealed his conviction and sentence be detained unless the court finds

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . .; and
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in (i) reversal, (ii) an order for new trial. . . .

18 U.S.C. § 3143(b)(1).

The Court finds that Defendant is not likely to flee or pose a danger to the safety of the community and that his appeal is not for the purpose of delay. However, the Court concludes that Defendant has not raised a substantial question of law or fact that is likely to result in reversal or a new trial. The burden rests with Defendant to persuade the Court that he meets the statutory conditions for release. See United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985). Defendant here has failed to make the necessary showing. Accordingly, his motion for an appeal bond is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Douglas Moss's Motion for New Trial. (Doc. 137). Finding no basis to postpone Defendant's date for voluntary surrender or to grant Defendant a bond pending appeal, the Court

**DENIES** Defendant's Amended Motion to Delay Reporting or for Bond Pending Appeal. (Doc. 189).

       **SO ORDERED** this 10th day of December, 2019.


                        ***s/ Hugh Lawson***_____
                        **HUGH LAWSON, SENIOR JUDGE**

aks